UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | *Criminal No. 07-125-P-H* |
| | ) | |
| JON R. HUGHES, | ) | |
| | ) | |
| Defendant | ) | |

*RECOMMENDED DECISION ON MOTION TO SUPPRESS*

Jon R. Hughes, charged by indictment with transportation and possession of child pornography in violation of 18 U.S.C. §§ 2252A(a)(1) and 2252A(a)(5)(B), Indictment (Docket No. 18), moves to suppress all evidence obtained on October 18 and 23, 2007. Defendant's Motion to Suppress ("Motion") (Docket No. 34). An evidentiary hearing was held before me on June 16, 2008 at which the defendant appeared with counsel. Seven exhibits were offered by the government and admitted without objection, and five exhibits were offered by the defendant and admitted without objection. Two witnesses testified for the government and three for the defendant, including the defendant himself. I now recommend that the following findings of fact be adopted, and that the motion be denied.

**I. Proposed Findings of Fact**

Dr. Scott Schiff-Slater, the Tele-Med physician for the town of Isle au Haut, Maine, has practiced family medicine in Hallowell, Maine since 1990. He first spoke with the defendant in late summer or early fall of 2007. At that time the defendant was very depressed, to a degree that affected his daily functioning. He has no idea what the defendant's Global Assessment of

1

Functioning ("GAF") was at the time. The defendant was emotionally depressed, not sleeping well, and suicidal at times. The judgment of anyone so depressed would be affected; it is the nature of depression to affect one's judgment. He was concerned from their first telephone call for the defendant's safety, knowing that the defendant had attempted suicide in the past. Defendant's Exhibit 1 is a copy of an office note that he faxed to the Knox County Sheriff's Office on October 17, 2007, to document some telephone calls he had made to that office to convey his assessment that the defendant presented a significant risk of suicide and a danger to others. If "confronted by the state police," he wanted the defendant to be brought in for evaluation as to his own safety; he wanted the defendant to be "blue papered" if he would not go voluntarily. "Blue papering" means involuntary commitment due to mental impairment. Dr. Schiff-Slater was present on Isle au Haut when the defendant was taken voluntarily to Penobscot Bay Medical Center on September 29, 2007. About three weeks after that, the defendant was involuntarily committed to Penobscot Bay Medical Center. Defendant's Exhibit 2 consists of the defendant's medical records from Penobscot Bay Medical Center; the exhibit was ordered sealed without objection, and a redacted version substituted in its stead.

Detective Laurie Lynn Northrup has been with the Maine State Police for 20 years and has been a detective with the Computer Crimes Unit for over three years. Sergeant Glenn Lang is in charge of the Unit, which is based in Vassalboro. Northrup also deals with crimes against children. On October 10, 2007, Lynn Talbot, the Knox County victim-witness advocate, called the Unit regarding a 15-year-old girl who had discovered naked photographs of herself on her guardian's computer. On October 15, 2007, Northrup interviewed the victim at the Knox County Sheriff's Office. The victim said that she found the photographs of her in the bathroom in January 2006. She then searched and found a camera hidden in a radio in the bathroom.

Thereafter, she covered the camera with a towel when she was in the bathroom, or dressed and undressed outside the bathroom. She said that the defendant, her uncle, had sent her an e-mail apologizing for accidentally catching her on videotape and admitting that he had looked at the photographs or videotape several times before deleting them. The victim had been living with the defendant since she was twelve years old. She said that she recently had left the defendant's residence because he found out that she was having sex with her boyfriend and refused to let her go back to school.

    Northrup conferred with Lang and they agreed that they would have difficulty obtaining a search warrant for the defendant's residence and computer due to the possible staleness of the information provided by the victim. They decided to do a "knock and talk" with the defendant at his residence on Isle au Haut and ask for consent to look at the computer and the videotape. They will often seek a search warrant after such an interview, so they took templates for affidavits and a warrant application with them and also arranged with people in their office on the mainland to initiate that process if necessary. They were aware of Dr. Schiff-Slater's letter to the sheriff's office saying that the defendant might become suicidal or homicidal if confronted. Deputy Scott Johnson of the sheriff's office went with them due to this concern. He wore civilian clothes. They were also accompanied by Agent Manning Jeter of the Secret Service.

    Northrup and Lang wore army fatigue pants and navy Maine State Police T-shirts and wore visible guns in holsters. They went to the defendant's residence on October 18, 2007 at approximately 11:30 a.m. Jeter, in civilian garb, was armed, but his weapon was not visible. The defendant was at home. Lang spoke with him first, telling the defendant that the officers were conducting an investigation and would like to come into the house and talk with him. The

3

defendant gave them permission to enter his house.[1] At this time, the defendant did not appear to be under the influence of any drug, including alcohol; he was articulate, calm, and quiet, and fully dressed. Northrup carried a tape recorder, which she turned on outside the house and left on throughout the time the officers were in the house. Government Exhibit 1 is a compact disc with a copy of the recording made that day. Government Exhibit 1A is a transcript of the recording. The tape recorder did not capture the initial exchange between Lang and the defendant. At the time, the officers had no plans to arrest the defendant, although, due to the letter from Dr. Schiff-Slater, they knew that they had to make sure that the defendant was not left on the island when the interview was finished. As noted, that was Johnson's area of responsibility.

The interview took place in the defendant's living room. It was a small room in a very small house. There was a half-wall between the living room and the kitchen, and the officers could see a laptop computer on a table in the kitchen as they walked into the house. During most of the time that the officers were in the house, Jeter stayed in the kitchen, Johnson was in and out of the house, and Lang and Northrup stayed in the living room.[2] The defendant answered Lang's initial questions appropriately.[3] When Lang began to ask the defendant about the photographs of

---

[1] The defendant testified that he only agreed to talk with the officers, not to let them come into his house, and that they came into his house without asking permission to do so. I credit the testimony of Northrup and Lang to the contrary on this factual point.

[2] The defendant testified that the officers "surrounded" him when they entered the house and "backed [him] into a corner," although he later diagrammed his position as backed against the half-wall between the kitchen and living room. Defendant's Exh. 4. He also testified that Jeter was three to four feet behind him at this time, a position which would not have been possible if the defendant had been backed into a corner and also would have put Jeter in the kitchen on the other side of the half-wall. The defendant also testified that all four officers ranged in a semicircle around him, each about six to eight feet away, as depicted in his diagram. Based upon the testimony at the hearing, I find that the officers did not attempt to intimidate the defendant physically when they first entered his house.

[3] The defendant testified that he was immediately terrified by the presence of the officers and was "not thinking clearly" from the moment the questions began. As evidence of this, he said that he could not answer "a simple question" about when his niece came to live with him, saying that it was in 1992, when 2003 was the right year, and could not remember the last name of his former girlfriend, Jackie. The transcript shows that this latter lapse occurred when the defendant volunteered that could not remember Jackie's last name, when he returned to the living

the naked victim, physical changes in the defendant began to be visible. He asked for a washcloth and Lang gave him one. He was sweating and hyperventilating and began gagging and dry heaving, then lay on the floor. The officers arranged for an emergency medical technician ("EMT") who lived on the island to come and examine the defendant. While they waited, Northrup asked the defendant his name and where he was, and the defendant was able to answer correctly. The EMT who arrived was Diane Barter, a friend and neighbor of the defendant. By the time she arrived, the defendant had pulled himself up to lean against the couch. The EMT took the defendant's blood pressure and vital signs and said that the vital signs were normal. She helped the defendant to breathe more slowly. She said that she thought the defendant had had a panic attack. About 15 to 20 minutes after the defendant's symptoms had become apparent, he appeared to recover from them.

After the EMT left, the defendant asked to smoke a cigarette and Lang and Northrup accompanied him outside so that he could do so.[4] While he was smoking, the defendant talked with the officers in a coherent fashion about lobstering. Northrup could see the defendant's physical appearance improving as he smoked. When Lang asked a question about the matters that the officers had come to investigate, the defendant told him that he would talk further with the officers after he finished his cigarette and went back inside the house. After he finished smoking, the defendant said, "Okay, back inside."

When everyone was back inside the house, Lang asked the defendant whether the officers could take a look at his computers and DVDs to make sure that the pictures or tapes of the victim

---

room after smoking a cigarette outside. Govt. Exh. 1A at 28. In any event, I do not find such lapses to be indicative of such a serious mental limitation that the officers should not have continued to question the defendant or that he must be found to have been incapable of giving consent to the officers' entry.

[4] The defendant testified that when he asked to smoke a cigarette, one or more of the officers said, "No." On cross-examination, it became clear that the defendant interpreted the officers' request that he smoke outdoors, due to their sensitivity to the smoke, as a refusal of his request. The audio tape does not bear out the assertion that the defendant's request to smoke was ever denied, and he in fact did smoke a cigarette outside.

were gone. The defendant did not respond to this question. After several minutes of further conversation, the defendant went into another room and retrieved some videotapes from behind books on a shelf, a place where Lang believed they would not have been found otherwise. He also showed the officers how the camera in the bathroom had been set up. After another period of conversation, Lang asked the defendant to sign a consent to search form. The defendant replied, "[L]et me think about this before I give consent." Govt. Exh. 1A at 43. He then offered to show Lang and Northrup where "everything I have of [the victim] is – it's all in one folder [on the computer]." *Id*. Later, he said, "[M]y choices are to sign this or not." *Id*. at 47. And then, "[W]hat happens if I don't sign it? I'm just . . . I just want to . . . know what the – what the ramifications are." *Id*. Lang told him that the computer and the videos were contraband and were "probably coming with us regardless." *Id*. Shortly thereafter,[5] the defendant said, "I don't see what advantage there would be to me, to not cooperate here." *Id*. at 48. He then signed the consent form that is Government Exhibit 2.[6]

During the time that the officers were in the defendant's house that day, none of the officers ever raised his or her voice, none of them drew a firearm, the defendant never asked for the interview to stop, the defendant never asked to speak with a third party, or asked the officers to leave his house. After the interview was completed, Johnson told the defendant that he would have to go to Penobscot Bay Medical Center. When the defendant declined to go voluntarily,

---

[5] During the conversation that took place while the defendant was considering whether to sign the consent form, he said, "Videos, um, probably – jeeze, I'm getting dizzy again, ah, maybe fifty or a hundred videos of young girls um, total . . . ." Govt. Exh. 1A at 45. Lang testified that the defendant's appearance did not change at this time nor was there any change in the way he answered questions; he appeared very coherent and responded appropriately. To the extent that the defendant means to argue that he was not competent to sign the consent form, I find Lang's testimony credible on this point and reject that argument.

[6] The defendant testified that Lang was sitting next to him on the couch when he asked the defendant to sign the consent to search and that, because Lang was a big man, larger than the defendant, and leaned toward him slightly with a changed facial expression and tone of voice, he was frightened and perceived Lang's actions as threatening. I conclude that any such conclusion by the defendant was not reasonable and that Lang did not intend to threaten or intimidate the defendant into signing the consent form, nor did he do so.

Johnson put handcuffs on the defendant. Johnson transported the defendant off the island on the same boat that took the other three officers off the island.

Lang took the items listed on Government Exhibit 2 into custody and secured them in the state police lab in Vassalboro until a search warrant was obtained from the Kennebec County Superior Court the next day. He then performed a preliminary review of the objects.

Lang and Northrup next saw the defendant on October 23, 2007, when they interviewed him in a conference room at Penobscot Bay Medical Center. They went to the hospital, from which the defendant was about to be discharged, to arrest him on state charges. They intended to question him about some photographs from the seized materials. When they met, Lang informed the defendant that he was under arrest and read him his *Miranda*[7] rights. The defendant signed a waiver of these rights (Government Exhibit 4), and the ensuing conversation was recorded by Northrup. A compact disc of this recording is Government Exhibit 5. When the defendant said, "Maybe I should talk to a lawyer," the interview ended. As they reached the hospital parking lot, Lang realized that he had not asked the defendant whether he felt that the officers had treated him fairly, a question that he usually asks at the end of his interviews. He asked Northrup to turn the tape recorder on, and the conversation that is recorded on the compact disc that is Government Exhibit 3 was recorded. Government 3A is a transcript of that conversation. The defendant said, "I feel that I have been treated fairly. I think you've explained everything to me. . . . I was pretty distraught when you guys showed up, cause -- . . . somewhere down in here, I knew what was happening." Govt. Exh. 3A at 1. After that conversation, the officers took the defendant to the county jail in Rockland.

I find credible Lang's testimony that, in his experience, a person's voice will drop dramatically when he is confessing to a crime. A dejected tone in the voice is common. I credit

---

[7] *Miranda v. Arizona*, 384 U.S. 436 (1966).

the testimony of Lang, Northrup, and the defendant that the defendant was told several times that he did not have to speak with the officers. The defendant himself testified that no one forced him to say anything.

The defendant also testified that his anxiety attack did not start as soon as the police arrived on October 18, but the stress started building then, and stress is what causes a panic attack. He testified that he felt "very overwhelmed" when he answered his door and saw four police officers there and that, because they asked whether he had any guns or weapons, he assumed that he was under arrest despite being told by Lang that he was not. He testified that he was "very frightened . . . terrified" and intimidated from the beginning of the interview. His panic escalated, he said, over a period of "five minutes or so" to the point where his heart was pounding, he was very hot, and his vision was blurring. He asked for the wet cloth, but it did not help. He said he was dizzy and then immediately lost his vision and fell to the floor. He tried to get up but could not. While smoking outside he felt "pretty unstable" and his knees were weak. He testified that he told the officers that he would go inside and talk after he finished his cigarette "three minutes after the worst panic attack I ever had." He testified that he felt so afraid that he would have another panic attack that he was overwhelmed and bewildered and wanted to do whatever was necessary to prevent that. He could not ask the officers to leave as that would lead to confrontation, and his "only choice" was to answer all of the officers' questions and tell them everything that they wanted to know. He did not testify to what outward signs of this inner turmoil he displayed to the officers.

The defendant testified that "in retrospect" he would not have phrased his answer to Lang's question in the parking lot quite the way he did. He now feels that the officers should not have continued to question him after the panic attack but rather have given him at least two days

to recover from it.  He agreed that he was able to tell Lang exactly where to find the pornography files in his computer and to show the officers how he had set up the camera in the bathroom.  He testified that he made decisions under duress on October 18 that he would not have made if he had not been distraught.

Dr. Ronald Breazeale testified as an expert witness for the defendant.  He holds a Ph.D. in clinical psychology and has practiced for 25 years in Portland.  He tested the defendant on the Minnesota Multiphasic Personality Inventory, a reliable tool well-accepted in his field, and with the Thematic Apperception Test and projective figure drawing, as well as interviewing him in March and April 2008.  He reviewed the records of the defendant's admissions to Penobscot Bay Medical Center and Dr. Schiff-Slater's notes, as well as the police reports and audio records and transcripts of the October 18 and 23 interviews.  He concluded that the defendant has difficulty tolerating mild stresses and demands and dealing with authority figures; that the defendant is deeply affected by events and reacts to them extremely; that the defendant's depression is overwhelming at times; and that he has a good deal of anxiety without many resources to deal with issues.  He stated that depression makes a person much more indecisive and may at an extreme affect the person's ability to reason and exercise judgment and decrease his ability to concentrate or make decisions.  Suicidal ideation, he said, indicates a more severe depression that is more likely to affect judgment, impair the ability to think or make decisions, affect memory, increase difficulty in concentrating on what another person is saying, and leaves the person focused on his fears rather than on what is going on around him.

Dr. Breazeale testified that the defendant suffered a panic attack on October 18, 2007.  The criteria of a panic attack include an onset period of 10 minutes in which the symptoms escalate, including extreme fear, breathing difficulties, sweating, and heart palpitations.  The

symptoms become the individual's major focus and memory becomes impaired and the person has difficulty speaking. The person may have impaired ability to think logically. The attack may last for 30 to 60 minutes after which the individual may still suffer some of the symptoms if the stressors are still present. Most people do not lose consciousness during a panic attack. Dr. Breazeale noted that, during the 10-minute onset, the symptoms and effects may not be apparent to anyone other than the person undergoing the attack. An individual may be talking and appear to be focusing, concentrating, and responding yet be experiencing symptoms. Anxiety disorders are commonly a way to avoid dreaded objects or situations.

On October 18, 2007, Dr. Breazeale opined, the police were the stressors for the defendant. The attack started soon after they questioned the defendant's credibility. Dr. Breazeale stated that the defendant's behavior was affected by his desire to avoid the interview. He wanted the police to leave but felt that he did not have the right to ask them to leave. His ability to make decisions was affected. He understood some of the questions the officers were asking but was not able to understand or answer others. Dr. Breazeale's report is Defendant's Exhibit 3 and his curriculum vitae is Defendant's Exhibit 3A.

Dr. Breazeale agreed that the defendant is of average or above-average intelligence. He stated that one of the after-effects of a panic attack is anticipatory anxiety about having another attack, so that the person could appear normal but "inside he's falling apart," especially if the stressors were still present.

## II. Discussion

At oral argument, counsel for the defendant contended that *Colorado v. Connelly*, 479 U.S. 157 (1986), is the "seminal case" in support of his position. He argued that the officers' "trickery," combined with the defendant's "limited functionality," required that all information

and evidence they acquired on October 18, 2007, or as a result of that acquired information and evidence, must be suppressed.  In *Connelly*, the defendant approached a police officer on the street and told the officer that he had murdered someone and wanted to talk about it. 479 U.S. at 160.  The officer immediately advised the defendant of his rights under *Miranda*. *Id*.  The defendant said that he understood his rights but still wanted to talk about the murder. *Id*.  In response to the officer's questions, he denied that he had been drinking or taking any drugs and stated that he had been a patient in several mental hospitals in the past. *Id*.

After a homicide detective arrived and again advised the defendant of his rights, the defendant confessed to a specific murder that had taken place some nine months before. *Id*.  He led the officers to the location of the murder. *Id*. at 160-61.  The detective perceived no indication that the defendant was suffering from any mental illness. *Id*. at 161.  After being held overnight, on the following morning the defendant became visibly disoriented, giving confused answers to questions and saying that voices had directed him to come to Denver and confess. *Id*.  He was sent to a state hospital and initially found incompetent to assist in his own defense. *Id*.  Several months later he was found competent to proceed to trial. *Id*.

At the hearing on the defendant's motion to suppress his confession, a state psychiatrist testified that the defendant was in a psychotic state as of the day before he confessed. *Id*.  In his expert opinion, the defendant's mental condition on the day he confessed interfered with his ability to make free and rational choices, because the voices he heard were directing his actions. *Id*.  In his opinion, the defendant understood his rights when the officers told him about them. *Id*. at 161-62.  The Colorado state trial court found that the defendant's statements were involuntary, and the state supreme court affirmed. *Id*. at 162.  The United States Supreme Court held first that, while the mental condition of a defendant had become a more significant factor in

the "voluntariness" calculus, this fact did not justify "a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id*. at 164. Where the trial court's finding that the police had committed no wrongful acts was not challenged on appeal, the Supreme Court reversed, holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id*. at 167. The Court rejected the defendant's argument that the psychiatrist's opinion that he was not capable of free will in deciding whether to invoke his right to remain silent meant that the confession must be suppressed. The Court held that the Fifth Amendment privilege is not concerned with psychological pressures to confess emanating from sources other than official coercion. *Id*. at 169-70.

Applying *Connelly* to the present case, it is apparent that none of the statements made by the defendant on October 18, 2007 need be suppressed. Dr. Breazeale's carefully-expressed opinion was that the defendant's ability to make decisions was "affected" by his panic attack that day and that depression generally may affect a person's ability to reason and exercise judgment. He also said that, during the 10-minute period of escalation after the onset of a panic attack, it will not necessarily be apparent to an observer that the individual is suffering any symptoms. Nothing that Dr. Breazeale said in his testimony or in his report establishes that anything said by the defendant on October 18 or seized by the officers that day must be suppressed. There must still have been "official coercion."

To the extent that the defendant suggests that the actions of the officers on that day constituted coercion because the officers knew that the defendant was unusually susceptible to suggestion due to his mental condition, the record does not support that characterization. The

12

detectives who questioned the defendant were Lang and Northrup. They acknowledged reading the office notes that Dr. Schiff-Slater faxed to the sheriff's department, but nothing in that document can reasonably be read to inform them that the doctor believed that the defendant was in any way more susceptible to suggestion or pressure than any other person. Def. Exh. 1. The doctor's concern, as expressed in that document, was that the defendant was at great risk for suicide or homicide if left alone on the island after being "confronted" by the police. *Id.*

Counsel for the defendant emphasized at oral argument that the officers on October 18 had engaged in trickery and intimidation. I conclude that there is no evidence of conduct by Lang or Northrup that anyone other than the defendant could have perceived as intimidating, given what either officer had reason to know about the defendant's mental state. If Lang and Northrup did not and could not have known that the defendant would perceive as intimidating conduct that was not, in any reasonably objective sense, intimidating, *Connelly* makes the defendant's subjective perception irrelevant.

With respect to the allegation of trickery, the only evidence cited by defense counsel was an assertion that the defendant was in custody from the moment the police entered his house. They knew that he was going to be taken off the island as soon as the interview was over, and yet Lang repeatedly told him that no one was going to arrest him. That statement by Lang, however, was in fact true. Assuming *arguendo* that it was nonetheless "trickery" for Lang not to also tell the defendant that Johnson was present to take him to the hospital for his own protection at his doctor's orders post-interview, counsel for the defendant asserted in oral argument that "the courts are unhappy about trickery when the defendant has limited functionality," but cited no case law in support of this assertion. The case law cited in his motion is unavailing.

In the pre-*Miranda* case of *Blackburn v. Alabama*, 361 U.S. 199 (1960), the defendant was convicted of a robbery that took place while he was away from a mental ward without authorization. The court had been provided with the report of three physicians who found that the plaintiff was insane at the time of the robbery and the testimony of two psychiatrists that he was insane at the time of his confession, and the interrogation leading to the confession had extended over eight or nine hours in a very small room with at least three officers present, *id.* at 201-04. The Supreme Court held, in relevant part:

> In the case at bar, the evidence indisputably establishes the strongest probability that [the defendant] was insane and incompetent at the time he allegedly confessed. Surely in the present stage of our civilization a most basic sense of justice is affronted by the spectacle of incarcerating a human being upon the basis of a statement he made while insane . . . . And when the other pertinent circumstances are considered – the eight- to nine-hour sustained interrogation in a tiny room which was upon occasion literally filled with police officers; the absence of [the defendant's] friends, relatives, or legal counsel; the composition of the confession by the Deputy Sheriff rather than by [the defendant] – the chances of the confession's having been the product of a rational intellect and a free will become even more remote and the denial of due process even more egregious.

*Id.* at 207-08. In the case at hand, there is no evidence that the defendant was mentally incompetent, or, if he was, that the officers knew or had reason to know that; there was no extended interrogation in a tiny room in a police station; and there is no evidence that Lang suggested to the defendant what he should say. *Blackburn* is clearly distinguishable.

*Townsend v. Sain*, 372 U.S. 293 (1963), the other case cited by the defendant, Motion at 3-4, is also a pre-*Miranda* case and even more distinguishable on its facts. In that case, the issue was the circumstances under which a federal court must hold an evidentiary hearing on a petition for habeas corpus filed by a state prisoner. 372 U.S. at 295. The new evidence proffered by the defendant was that drugs given to him shortly before he confessed to a crime which he had

denied committing over the preceding 24 hours, while purportedly to treat his withdrawal symptoms, actually acted as a "truth serum." *Id*. at 297-300, 303-05. The Supreme Court observed: "It is difficult to imagine a situation in which a confession would be less the product of a free intellect, less voluntary, than when brought about by a drug having the effect of a 'truth serum.'" *Id.* at 307-08. Nothing approaching these circumstances is present in the case at bar.

The First Circuit's decision in the unpublished case of *Larrivee v. MCC, Supt*., 10 F.3d 805 (Table), 1993 WL 487834 (1st Cir. Nov. 29, 1993), does not support the proposition for which it is cited by the defendant: "[a] confession which is the product of a critically impaired intellect must be suppressed." Motion at 3. Indeed, the First Circuit found that "there is nothing to indicate that petitioner was anything else but of normal intelligence." Id. at *2. I have already indicated that I find credible the officers' testimony that they received the defendant's permission to enter his residence when they first went to his door. I conclude that the fact that the defendant may not have felt free to leave his house after Lang and Northrup began to question him was due only to the defendant's mental condition, and not to any actions or intended actions of the officers. Law enforcement officers should be able to question witnesses or suspects whom they do not intend to arrest, even when those individuals thereafter will require involuntary commitment to a psychiatric facility as the result of their hypersensitivity to questions and events that would not so affect an individual not suffering from depression or some other mental impairment. If not, law enforcement officers would not only be significantly impaired in conducting investigations, they would be required to become lay psychiatrists in order to be able to discern that the witness or suspect was suffering from a mental condition causing such abnormal sensitivity. Because he had allowed the officers into his home and because the officers' questioning was objectively reasonable, the defendant in this case was not

in custody for purposes of the *Miranda* analysis during the time that he was being questioned by Lang and Northrup.

Defense counsel's final argument at oral argument was that the officers' failure to take the defendant to the hospital when the panic attack occurred "shocks the conscience," citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973). *Schneckloth* establishes the factors to be taken into account when determining "whether a defendant's will has been overborne in a particular case," rendering any confession involuntary. 412 U.S. at 226. Nothing in the officers' conduct on October 18, 2007 shocks the conscience.

They summoned medical assistance for the defendant when the signs of his panic attack became apparent. The defendant's friend and neighbor, who was the EMT who responded, opined that the defendant had suffered a panic attack and stated that his vital signs were normal. She did not mention the possibility of hospitalization. Under these circumstances, the officers could not reasonably have been expected nonetheless to transport the defendant to the hospital and forebear any further questioning. The officers were entitled to rely on the EMT's professional assessment. After the panic attack, the defendant was able to tell Lang that he would not speak with him further until he finished smoking his cigarette, and he decided when he and the officers would reenter his house. Later, he was able to tell Lang in detail where to find certain material on his computer, to describe the camera and wiring in his bathroom, and to find his well-hidden videotapes. There is nothing to shock the conscience in these facts.

These conclusions make it unnecessary for me to consider the government's alternative argument based on the doctrine of inevitable discovery. Government's Opposition to Defendant's Motion to Suppress (Docket No. 41) at 16-17.

With respect to any statements made on October 23, 2007,[8] the defendant's primary argument is that those statements must be suppressed as fruit of the poisonous tree. Motion at 2. Because I have concluded that the statements and physical evidence from October 18 need not be suppressed, there is no poisonous tree. If the defendant means to suggest that any statements he made either in the hospital or in the hospital parking lot on October 23 must be suppressed because he had asked to speak to an attorney while inside the hospital and the questions put to him thereafter violated his *Miranda* rights, that argument is also unavailing. I have listened to the tape recording of the entire interview that took place in the hospital conference room on October 23, 2007. The defendant only mentions a lawyer 15 minutes into the interview, in the following statement: "This is stuff I maybe should be telling to a lawyer." Govt. Exh. 5 at 15:05. He then continues speaking with Lang and Northrup, without any prompting by or questions from either officer. There could not have been any *Miranda* violation even if the officers attempted to elicit incriminating information after the defendant made this statement. *Davis v. United States*, 512 U.S. 452, 455, 459-60 (1994) ("Maybe I should talk to a lawyer" found not to invoke right to counsel). Finally, the transcript of the taped conversation in the parking lot, Govt. Exh. 3A, does not reveal that the defendant made any incriminating statements at that time, and there is no basis on which to order the suppression of any statements made at that time.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum*

---

[8] The evidence did not suggest that any physical evidence was seized on that date.

*and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 8th day of July, 2008.

/s/  John H. Rich III
John H. Rich III
United States Magistrate Judge